UNITED STATES DISTRRICT COURT
DISTRICT OF CONNECTICUT

LUIS ORTIZ,
MICHAEL LEO
Tyquan Williams                    :                    JURY TRIAL DEMANDED
    Plaintiffs                 :
                                   :
v.                                 :
                                   :
DONALD REMSON (I/O)                :
PASQUALINO BRUNO (I/O)                           :
STATE OF CONNECTICUT,
DEPARTMENT                         :
OF TRANSPORTATION                  :
    Defendants.               MARCH 27, 2019

## **COMPLAINT**

## I.   **JURISDICTION**

1.      The jurisdiction of this court is invoked pursuant to Title 28 U. S. C. §§1331, 1343

(a) (3) and (a) (4), 2201.  Jurisdiction of this court is further invoked pursuant to Title 42

U. S. C. §1981, 1983, and 1988 and supplemental jurisdiction.

## II.   **VENUE**

2.      Venue is proper in this court inasmuch as the acts alleged herein occurred within

the State of Connecticut.

## III.   **STATEMENT OF FACTS**

3.      Plaintiff is Luis Ortiz who is a citizen and resident of the State of Connecticut.

4.      Plaintiff is an Hispanic-American male who has been employed as a Maintainer II

with the State of Connecticut, Department of Transportation since on or about July 2012.

5.      Plaintiff has also been union steward since on or about August 2017 and so has access to information regarding the employment policies, procedures and practices at the Milford Garage and treatment of employees.

6.      Defendant State of Connecticut, Department of Transportation (hereafter referred to as "DOT"), is an employer within the meaning of Connecticut General Statutes §31-51q.

7.      At all times material herein Donald Remson has been employed as the District Manager for DOT with responsibility for policy setting and enforcement and oversight over the employees of the Milford Garage. He is sued in his individual and official capacity.

8.      At all times material herein Pasqualino Bruno has been employed as a Supervisor for DOT with responsibility for policy setting and enforcement and direct supervisory responsibility over approximately sixteen (16) to twenty (20) Maintainer employees.  He is sued in his individual and official capacity.

9.      For at least the past six months District Manager Remson and Supervisor Bruno have caused and/or permitted a hostile work environment based upon race and ethnicity to exist for employees of the Milford Garage.

10.     The hostile environment has consisted of racially and ethnically derogatory statements, including but not limited to the following.

        (a) On or about October 2018 Crew Leader Joseph Kelly, Caucasian male, was in the breakroom talking about the new white colored trucks that had been given to DOT employees. Previously the trucks had been colored orange. Employees had orange colored bracelets that sad "respect the orange" meaning, people were to respect the fact of them being employed by DOT for safety reasons. When the truck color was changed,

Kelly stated to multiple employees who were in the breakroom at the time (e.g. Ortiz Guss Cruz, Tyquan Williams and Dean O'Banner) "Now I'm going to get a white bracelet that says, "Respect the White."  He looked around at employees and said, "what do *you people* have to say about that" and then again stated "Respect the White".  Kelly repeated this about four times. Plaintiff Ortiz immediately reported this incident to Remson however, he is not aware that any action was taken.  Ortiz also reported this to the union after not hearing anything from management after a week.

(b) On or about October 2018, employees Arnoldo Cortez, an Hispanic-American male, Broderick O'Neal and Dean O'Banner, African-American employees, were in the breakroom. Dean, Broderick and Cortez were talking with each other about Dean's step brother.  Joseph Kelly, was not a party to the conversation but he interrupted what the employees were saying and stated "Dean, your father could not afford a television so he had to find other ways to entertain himself."  He was referring to entertainment by having children and was smirking when he made the statement. He stated that's why black people have so many kids.  Plaintiff reported this incident to the union, however he is not aware that any action was taken.

(c) On or about February 3, 2019 Russell Reid, a Caucasian male employee, was playing a very loud speech on his cellphone. The speech stated that minorities and illegal aliens are not normal human people and that is why we need a wall to keep them out of America. He did this while shaking his phone at Ortiz, Dean and Tyquan. Ortiz and others have heard Reid and Kelly each,  on at least thirty times within the last six months use the phrases "worthless niggers", "good for nothing niggers", "lazy niggers", "piece of shit niggers"; "loud mouth spics", "ghetto Puerto Ricans", "dirty Mexicans", "good for nothing

spics".  These things are being said directly to the black and Puerto Rican employees. Plaintiff Tyquan Williams was also sitting at this table when Fred Chrisolo was playing loud music that repeatedly used the "N" word.  Employees in the area who heard this were offended so Chrisolo was asked to turn the music off.  He was smiling the entire time but refused to turn the music off. Ortiz reported this incident to Bruno on or about February 3. Bruno stated that he would address the matter.  He never did.  However, the next day he read from a piece of paper to employees who were assembled on the job a statement that said we must be careful how we play YouTube, Facebook, pornography. But his statement did not address the issue of racially derogatory statements and conduct in the workplace which is what the complaint had been.  Plaintiff Ortiz approached Bruno twice and Remson once about correcting the situation and the racial rhetoric. On each occasion Remson and Bruno stated that they would address the matter but never did other than what has been described.

(e)  African-American employee Dean O'Banner has been made on occasions by Lino Bruno to clean his shoes.  Bruno would stand and hold out his leg, telling O'Banner to clean off his shoes.  Then Bruno stood and held out his other leg while O

Banner cleaned his shoes.

11.    Management at the Milford Garage has regularly refused to provide the same training opportunity to Hispanic and African-American employees as it has for Caucasians.

(a) On or about August 2018 Plaintiff Ortiz was brought into a meeting with Vick Garino and Joseph Kelly, Caucasian males, and was promised training to fill a graded position as a Road Inspector.  Instead of giving the training to Plaintiff, within a pay period

4

it was given to a Caucasian employee who had no seniority and who was still on new hire probation. Plaintiff reported this to the union district representative. Remson was also aware because he was in a meeting with the union once the complaint was made. Remson contacted Garino to present a signup sheet for people to sign up who wanted training but they never followed through.

(b)     On or about May 18, 2018 Vick Garino and Joe Kelly then promised Plaintiff Ortiz training on a "side flail" to make up for the missed inspector training. Again, Plaintiff was never given the opportunity to train. Ortiz was told to wait, has kept waiting but still did not receive training.  On or about the end of last summer around August/September. Ortiz was put on the machine but given no training. He remained on the machine for a couple days per week for about three weeks until the end of cutting season.

(c)     A few weeks later Plaintiff Ortiz again asked for training on the "side flail" and was told "no" by Garino and Kelly because they said it was Russell Reid's machine. Reid is a Caucasian male who has less seniority than Plaintiff.  Plaintiff then asked them to train him when Reid was not operating the machine but they refused. Ortiz was kept waiting and asking, and has been called a troublemaker and a loud mouth, as well as many derogatory words. Reid is the most openly racist employee; due to his racial slurs, body language, and how he attacks Black and Hispanic employees.  Although Reid can hardly walk, or lift anything weighty, DOT permits him to obtain "Q" time so that he gets higher pay but does not have to work.

(d)     When Plaintiff Ortiz complained to the Union, he was then targeted for retaliation, unfair treatment and ridicule.

(e)     During the first week of employment of Pasqualino Bruno, he asked if anyone wanted crew leader training. Plaintiff Ortiz stated that he wanted an opportunity for crew leader training. However, Plaintiff has still not received that training.

(f)     On or about August/September 2018 Plaintiff Ortiz asked for a shot at the "flail mowers" to gain more experience and training. Nick Gazzi and Russell Reid, two Caucasian employees, with less seniority were given the only opportunities. When Plaintiff complained to Kelly and Bruno and his union representative about not being given this training opportunity he was told to wait. Upon information and belief, Ortiz was later placed on the machine without training in order to cause him to fail. To date, Plaintiff has still not received the training.

(g)     On or about September/October 2018 Plaintiff was called into a meeting with Bruno who asked if Plaintiff was still interested in the inspector position. Plaintiff stated that yes he was.  Bruno stated that the inspector training would be made available to Ortiz and the job would be his. However, there has been no inspector training as of this time.  Plaintiff reported this to the union. A few days later after everyone had been told that Ortiz would get the position, management reversed course and did an announcement to the whole group to state that the inspector positon was being given to Gazzi, a Caucasian employee that again has less seniority.

(h)     Again, the inspector position was given to another Caucasian employee with less seniority than Plaintiff. During a Monday tail gate meeting Plaintiff asked when was hard work going to be rewarded or should he just stop working hard. Plaintiff was then brought to a fact finder by Bruno and Kelly for allegedly refusing to work even though

he never refused to work, but simply asked a question.  Remson was there that day and so was made aware of the issue.

12.     After Plaintiff filed internal complaints of discrimination based upon race and ethnicity, he became the subject of retaliatory action, including but not limited to the following.

(a)     By the end of the summer of 2018 Plaintiff had complained three (3) times about the lack of training and or opportunity to run a Q item machine. During this time two (2) employees with less seniority, Gazzi and Reid, both ran the machine, and got "Q pay" while Ortiz was told that he had to wait his turn.

(b) "Q pay" allows an employee to obtain higher level pay for higher classification work even though they are not yet promoted to such position. It is actually a way of qualifying an employee for work when a vacancy actually does occur.

(c)     A week later Kelly called Ortiz into the office, with Gazzi, and Joe Kelly, in the presence Fred Chrisolo and Gazzi.   Kelly was yelling and using foul language stating that Plaintiff had no respect for his rules because at 3:54pm Plaintiff had gone to his truck to open his windows, as it was a very hot day.

(d)     Plaintiff was threatened with a fact finder for leaving the building property. Plaintiff then asked if a white male would be written up for leaving the building to smoke such as Jim Michilac, Caucasian male, did or leaving the building early to go home as Matt Fabien, Caucasian male, did.

(e)     Kelly was very angry because Ortiz's comment proved that Kelly was targeting Ortiz. So, in front of Fred and Nick, Kelly stated "as long as I'm here you will never get a grade, never get any "Q time", or even touch a machine.  Ha, what do you

have to say about that and so that you can't say anything about race, I'll give it to Guss, what do you think about that?" Gus is another Hispanic employee.

(f)     On or about November 2018 Plaintiff was written up while being a passenger in a DOT truck when the driver, Gary Cole, a Caucasian senior employee, (who also took it upon himself to talk about slavery in Trumbull with Black employee Broderick O'Neal) parked behind the buildings to use the bathroom.   Plaintiff stayed in the truck, however he was written up.

(g)     In another incident on or about November/December 2018 three weeks later Plaintiff was written up along with Gino Porto, Caucasian male, the driver for parking at a McDonalds at 11:55 am so that he could use the bathroom before lunch. Plaintiff written along with Porto as a cover.

(h) By contrast, Mike Leo and Porto took an unscheduled breakfast break from 9:30 to 10:00 but received no write up.  When two white employees are together they receive no write up.  However, if a Black or Hispanic employee is with a Caucasian employee they will write up both.

(i)     Plaintiff has been made to do menial tasks and belittled, while being told that management has the right to give an employee whatever job they want to.

(j)     Over the last two year period, at least a couple of times per week, Kelly has used assignment of the job of cleaning the bathroom to Ortiz as a punishment so that he can ridicule him. Generally Caucasian employees are not instructed to clean bathrooms. This appears to have happened only to a couple of white guys, far and few between. Ortiz and other minorities are given these assignments to clean the bathrooms a couple of

times a week.  The assignments have only slowed down since on or about the last couple months after Ortiz's complaints became more persistent.

(k)     As a public joke, Plaintiff has been yelled at "Hey don't you have toilets to clean" or "Hey clean a truck or clean a toilet" for Kelly's own amusement. This treatment is not given to everyone but only to those individuals that are minorities (Hispanic and African-American) or those Caucasians that are believed to side with the minorities.

(l)     Several employees have called the union about racist comments. Management's response was to have a tail gate about zero tolerance. However, it seems for the minority employees, zero tolerance means punishment or termination, but for the Caucasian employees there is a warning and everything is swept under the table.

(m)    About seven eight months ago; while everyone was in the breakroom for a tailgate meeting, employees were also told by Garino and Kelly that if anything were to happen again resulting in the union being called, they didn't care how far they had to go they would dig up dirt on the accuser.

(n)     Several times since on or about January/February 2019 Bruno has stated that "he's going to "f'ing take down Ortiz and anybody who stands with him. Bruno stated that he was going to punish everyone because he was angry with Plaintiff. A complaint was made about this to the union by O'Neal.  Ortiz has been told by Freddie Chrisolo and Kelly, Applebee and Reed, trying to warn him to "stop with the racism shit, calling niggers, spics." They appear to have been sent by DOT management to talk to him to drop his complaints.

(o)     On or about November 2018 Kelly intruded into Plaintiff's locker without his permission and removed a notebook that was kept there.  This notebook contained notes

that Ortiz had been keeping with dates, times and incidents of discrimination, retaliation and unfair treatment, also witness to events. Bruno has a key to Plaintiff's locker but he does not know how Kelly was able to access the locker without Plaintiff's permission. Another employee witnessed Kelly going through Plaintiff's locker with the notebook in hand; later it was missing. Because of the loss of his notebook Plaintiff is unable to have more exact dates and times for the events stated above. Plaintiff had opened up his notebook with these specific dates and times during a fact finder meeting and believe that is why it was stolen. Reid in breakroom has asked the question in a taunting way "they teach Puerto Ricans how to read", "they read in Puerto Rico"? Kelly and Bruno heard this but took no action to shut down nor did they correct Reid.

(p)     On three occasions since Plaintiff's notebook went missing, he has requested its return and told Kelly and Bruno to make a formal report of the locker theft and missing notebook. However, they ask no questions. They just stated "shut up get back to work, if you can't find something to do I'll find it for you, clean the toilets". Plaintiff has also reported to Bruno the fact that his notebook was taken by Kelly. Although Bruno stated that he would investigate it, nothing has been reported back to Plaintiff. Kelly stated in response to Ortiz's complaint of the stolen notebook, "that's what your people are good at doing", (stealing) cleaning toilets, being janitors. Kelly does not say that on those rare occasions when whites are assigned to do clean of toilets.

(q)     On January 7, 2019 in front of the Monday tailgate Bruno appointed the truck to Fred Crisolo, another Caucasian male. Ortiz asked if he would be his snow partner so that he could train him. Bruno stated "No, what did I tell you, I'm the Boss". Plaintiff then stated, "So you can just promise me things to shut me up and then make me

10

look like a fool and I'm supposed to not get mad". Bruno stated, "I'm the boss I make the decisions", then he stated "I run this garage, as he crossed his arms and smiled angrily at Plaintiff. So, Plaintiff then stated "yes but running it into the ground isn't something to be proud of".

(r)     Bruno then threatened the entire break room when he stated, "you think this is bad, from now on I'll make you people feel right at home and run this place like a prison and make sure I screw all of you guys".  Ortiz then stated "Great leader you are you treat me like dirt and when I get mad and point out your wrong you get mad and your answer is fuck all of us". Plaintiff then apologized and stated, "I'm sorry I see how things are, I'm a minority I'm not supposed to get anything sorry, I get it now, I'll be quiet".

(s)     During this tailgate meeting, everyone was there, there was a lot of yelling. There have been racial slurs regarding Puerto Ricans and knives. Most Blacks and Puerto Ricans are in fear of their jobs so that will not speak out against the racial slurs. Managers and supervisors, Bruno, Kelly, etc. are around to hear these racial slurs but do not correct the situation.

(t)     Plaintiff Ortiz has also been informed by other employees that on or since November 2018 Bruno has solicited multiple employees to make up false statements and testimonies about Plaintiff in order that he could create a reason to fire him. A Hispanic male employee and a Caucasian male employee, Plaintiff Michael Leo and Gus Cruz, have informed Plaintiff of this attempt to frame him for termination.

(u) Black and Hispanic employees have been advised that they should not leave their lunch around where others can access it because Kelly, Reid, Matt and Fabian have been seen spitting into the food of Black employees by Dean O'Banner.

13.     Plaintiff is Michael Leo, a Caucasian male, was employed as a Maintainer I since on or about September 1, 2018.  He worked at the Milford Garage.

14.     Plaintiff Leo immediately knew that something was not right when he observed that Arnaldo Cortez and Rod McNeil were in the garage painting trucks while he was out on the road getting experience, even though they had been working there longer than he.

15.     Plaintiff Leo witnessed and heard many racist conversations and incidences during his time at the Milford maintenance facility.

16.     Sometime in October, he overheard a conversation between Dean O'Banner and Rod McNeil in the break room. Joe Kelly came in and said something about Dean's family being so poor that they couldn't afford a television.

17.     On another occasion, Russell Reid was playing a video of a politician who was talking about building the wall. Russell Reid was yelling about how minorities are illegal aliens, how they are not humans, how they do not belong in our country, and that is why they are building a wall.

18.     On one occasion Plaintiff Leo witnessed Frederick Crisculo playing a video, which kept saying the "N" word repeatedly.

19.     There were multiple occasions when Leo heard Russell Reid and Joe Kelly calling Luis Ortiz, Arnaldo Cortez, and Sucre Cruz, a bunch of sp**s. They also said Rod McNeil and Tyquan Williams were worthless ni***rs.

20.     On one occasion when everyone was in the break room one morning getting their assignments, Luis Ortiz stated "How come me and Cruz never get to work together?". Frederick Crisculo, who was the crew leader at the time, said that if two Puerto Ricans worked together, nothing would get done and that's why we separate you all.

21.     There were also a couple of times where Lino Bruno and Luis Ortiz had gotten into arguments. On one of those times, Lino stated "I'm going to make you all feel at home and run this place like a prison and screw everyone".

22.     Everything that takes place in the Milford garage is racist and offensive. It made Plaintiff Leo to his stomach. He never said anything, even though he knew he should have. The reason Leo never said anything was because he was still on probation, and after seeing how things worked in the garage, he thought if he said anything he would be jeopardizing his job.

23.     While hearing all of these offensive things and witnessing all these unfair incidences, Leo was dealing with his own issues with management.

24.     In early December 2018, Leo was diagnosed with very bad Lyme disease. He ended up in the emergency room in Norwalk Hospital because of experiencing paralysis on the whole left side of his body. Leo took two days off of work per doctor's orders.

25.     When he returned to work, Leo gave the doctor's note and the discharge paperwork to Lino Bruno. When he informed Lino Bruno about the appointment he had made for the start of his treatment for the Lyme, Bruno told him that it was unacceptable and that he had to reschedule because he could not miss work.

26.     At the end of December, Plaintiff Leo took another day off of work because he had the flu. When he called Lino about the flu, he told Leo that he had to drive up to work to get a state form to be filled out by the doctor, even though Leo had another doctor's note.

27.     Leo informed Bruno that he was sick and could not get out of bed. He then said that Leo could print it off of the website.

28.     When Leo returned to work on January 2, 2019, he had the form that had been

requested along with the doctor's note.

29.     After this, Leo had his three-month job evaluation. He was told that he was given a "fair" service rating instead of and "exceed" because of his two sick occasions while being on probation. Plaintiff should have gotten an "exceed" for his evaluation because he took his job very seriously and did everything he was ever told to do.

30.     Plaintiff Leo was given his own truck and snow route when he was supposed to be with a crew leader. He had only one storm to train and immediately was on his own even though he told Lino Bruno that he was not ready.  Upon information and belief, Leo was being set up for failure.

31.     In January 2019, Plaintiff Leo told Lino that he would like to be 100% for overtime. When he asked Lino about switching to 100% for OT, he brought Luis Ortiz, who is the union steward, with him. Lino was furious that Luis was with Leo because they do not get along. Lino denied Leo's request.

31.     After this occasion of bringing Ortiz with him, Bruno began requiring Leo to clean toilets and pick up litter in the rain.  He had not previously been required to do these things.

32.     After that, the work place became more uncomfortable because, upon information and belief, Lino thought that Leo had chosen the side of Luis Ortiz.

33.     On or about February 1, 2019, Luis was expressing his feelings to Leo about a fact finder he had been in and word got to Lino about the conversation. Lino despises Luis.

34.     On Sunday February 3, 2019, Lino called Leo and left a message saying he had to speak to him about something.

35.     First thing on Monday February 4, 2019, Leo was called into the office by Lino. He

wanted to talk to Leo about what Luis Ortiz had said about the fact finder.  Bruno then asked Leo to write a statement.  Leo told Lino that Luis was just expressing his feelings about how unfair management was and that he did not think it needed to be documented because Ortiz said nothing wrong.

36.     Lino responded with "I'm sure you can come up with something to get his loud mouth out of here. Because if you can help me, I can help you". He then told Leo to take the day and think about it. At the end of the day Lino called Leo back in to the office and asked if he came up with something to testify against Luis with. Leo respectfully declined, saying he was not going to lie to get someone in trouble. Lino was not happy.

37.     After this request to make up a false statement about Luis Ortiz, Leo was given assignments of cleaning toilets and picking up litter in the rain.

38.     One night Leo received a call to come into work because of snow. He informed Joe Kelly that he was going to be a little while because he had to find a babysitter for his son and because he lived in Norwalk. Leo showed up to work just over an hour after the call and about five minutes after employee Gary Cole.

39.     The next day, Bruno gave Leo a verbal warning about coming in late, however Gary Cole, who lives 10 minutes away, did not receive a warning, despite coming in after Leo did.

40.     On February 12, 2019, there was a bad snow storm. Plaintiff Leo was paired with a spare help guy, Chris Munz, in the truck with him. Munz and Leo had an argument that morning because Leo had implied that he had to switch on and off with him and help plow. Munz called Lino to complain. Lino called Leo and told him to just leave Munz alone until Leo was tired and then he would drive.

41.     Leo plowed all day, from 8a.m. until about 7p.m., when he asked Munz to drive. He drove for about an hour. Leo then received a call from Joe Kelly telling him to drop Munz off for his rest break at 8 p.m. Even though Leo had been plowing all day, he dropped Munz off and headed back out to plow.  Leo then met up with Dean O'Banner and a contractor.

42.     Around 11 p.m. they were about to stop for coffee when Leo stated that he was running to his sister-in-law's house, about three blocks away from where they were stopping for coffee, to get some cash.  Leo was gone for about three minutes. While Leo was turning around after getting the cash from his sister-in-law, he went down the road and made a U-turn, being not too familiar with the area. Leo backed into a telephone pole but did not realize that it was a telephone pole. Instead he thought that he had hit a snow bank on the curb so he did not report it.

43.     Apparently the incident was filmed by a doorbell camera.  That is how Leo learned that he had hit a telephone pole. He was interviewed by a police officer who listened to the story and reviewed the tape. Plaintiff Leo was given a ticket for improper backing. That was Leo's first infraction/incident where he was in the wrong while being employed by DOT.

44.     In contrast, James Bryant is still on administrative leave for seven months after threatening to kill the boss, damaging state property, refusing to work, falsifying a workmen compensation claim, making racist and threatening comments, and driving so recklessly out of the parking lot that he almost hit the boss to cause intimidation. There is supposedly a zero-tolerance policy when it comes to threatening, violence or racism.

45.     Plaintiff Leo was terminated by DOT on March 8, 2019, allegedly because of the

one traffic infraction ticket that he received.

46.     Upon information and belief Plaintiff Leo was fired because he did not help Bruno to get Luis Ortiz fired by refusing to lie in a written statement for him.

47.     Plaintiff Tyquan Williams, African-American male, was first employed by DOT on Dec.14, 2017.  He is assigned to the Milford Garage as a Maintainer.

48.     From the start of his employment Plaintiff Williams would notice little things that would take place that did not seem quite right, but because he was the "new guy" he left it alone.

49.     As time went on it was became clear that the management was clearly trying to racially divide the workers and it was working.

50.     From his start date until March of 2018 Williams was constantly called in when others were not and told that he had to stay when the majority of employees were sent home on several occasions. Williams started to feel that he was being picked on but at the time he did not have his 6 months' probation in to ensure that his job would not be in jeopardy.

51.     A coworker of Williams, Arnaldo Cortez, informed him that Joe Kelly had confided that the primary goal was to "screw Tyquan" ultimately with excessive overtime and have him provide the shop other services.

52.     Later in 2018 Vic Garino left his position and it was given to Leno Bruno.

53.     From the moment Bruno arrived there has been nothing but racial incidents that are constantly being swept under the rug.

54.     For example, Williams was having an issue with another coworker Freddy Chrisolo playing vulgar music lyrics that were very suggestive/demeaning towards African

Americans.  The lyrics made Williams and other minorities so uncomfortable that he reported it to Bruno.

55.    Williams also reported to Bruno another coworker, Russ Reid, Caucasian male, who plays videos from his cell phone in the presence of other employees including in the breakroom at full volume stating that "minorities and immigrants are less than human".

56.    Bruno has threatened to "run the place like a prison" stating that "it will make us feel at home".

57.    On multiple occasions Williams' coworker, Applebee, a Caucasian male, stated to Arnaldo Cortez that "Tyquan is a lazy nigger".

58.    Joe Kelley has made it very clear to employees of his dislike towards Williams by stating this to his coworker Arnaldo Cortez, Luis Ortiz, Sucre Cruz, Dean O'Banner, and other white employees on multiple recent occasions.

59.    Williams recently learned that there were multiple meetings that were "Caucasian" only. The purpose of these meetings was to persuade other employees to make up false accusations and or stories against Luis Ortiz.

60.    Williams has observed that there has been serious tension particularly recently with employee/management interactions and it has had a negative impact on the morale of the shop.  Since witnessing and hearing the types of incidents at work described herein, Williams has suffered great emotional distress that has taken a toll on him.  The distress has been serious enough that he has had to reach out to the pastor from his church for counseling/coping skills to deal with the situations from work.

61.    It has been made very apparent to the minority employees involved that since Leno Bruno took over as manager, a heightened sense of open racism has grown rapidly

throughout the department for their own amusement in causing displeasure, anger, and stress.

62.     Management attempts to correct the situation consisted only of threatening, harassing, and discriminating as to instill fear to quiet all complaints.

**COUNT ONE:**      **PURSUANT TO 42 U.S.C. § 1983 (Racial Discrimination)**

1-62.  Paragraphs 1 -62 above are hereby incorporated by reference and made paragraphs 1 -62 of this Count One.

63.     The conduct alleged in paragraphs 1 – 62 amounted to discrimination against Plaintiffs due to their race.

64.     Plaintiffs have been damaged thereby.

**COUNT TWO:**      **PURSUANT TO 42 U.S.C. § 1983 (Hostile Work Environment)**

1-62.  Paragraphs 1 -62 above are hereby incorporated by reference and made paragraphs 1 -62 of this Count Two.

63.     The conduct alleged in paragraphs 1 – 62 establish the creation of a hostile work environment against Plaintiffs due to their race.

 64.     Plaintiffs have been damaged thereby.

**COUNT THREE:**      **PURSUANT TO 42 U.S.C. § 1983 (Retaliation)**

1-62.  Paragraphs 1 -62 above are hereby incorporated by reference and made paragraphs 1 -62 of this Count Three.

63.     The conduct alleged in paragraphs 1 –62 establish retaliation against Plaintiffs due to their engaging in protected activity in complaining about race discrimination.

 64.     Plaintiffs have been damaged thereby.

**COUNT FOUR:       PURSUANT TO CONNECTICUT GENERAL STATUTES § 31-51q**

1-62. Paragraphs 1 -62 above are hereby incorporated by reference and made paragraphs 1 -62 of this Count Four.

63.     The conduct alleged in paragraphs was speech on a matter of public concern regarding racially discriminatory treatment by DOT of its employees.

64.     Plaintiff Ortiz files this action alleging retaliation for his engaging in free speech rights as specified in Article First of the Connecticut Constitution.

65.     When Plaintiff spoke out on this matter of public concern, it did not materially interfere with his relationship with his employer.

66.     Plaintiff has been damaged thereby.

**COUNT FIVE:        SPOILATION OF EVIDENCE**

1-62. Paragraphs 1 -62 above are hereby incorporated by reference and made paragraphs 1 -62 of this Count Five.

63.     On or about November 2018, as alleged in complaint paragraphs 12 (o) and (p), Defendants caused the notebook of Plaintiff Ortiz to be stolen from his private locker.

64.     Defendants have failed and refused to return Plaintiff's notebook.

65.    The notebook was relevant to Plaintiff's claims against Defendant.

66.    The destruction of said notebook was done with bad faith and with the intention to deprive Plaintiff of his cause of action.

67.    As a consequence of the destruction of the notebook, Plaintiff has been deprived and/or hindered in his ability to fully establish the elements of his cause of action.

68.    Plaintiff has been, and continues to be, damaged thereby.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray judgment against Defendants and each of them as follows:

1. Declaratory relief;

2. Compensatory damages;

3. Costs of suit herein incurred;

4. Attorney's Fees; and

5. For such other and further relief as the court deems proper.

THE PLAINTIFF

BY:  _/s/Josephine S. Miller_
Josephine S. Miller, Fed Bar # ct27039
152 Deer Hill Avenue, Suite 302
Danbury, CT 06810
Tel:  (203) 512-2795
Fax: (203) 702-5188
Email: jmillerlaw@sbcglobal.net